## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) THOMAS P. HOGAN; and<br>(2) SJM 1, LLC, a foreign limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>(1) RANKEN ENERGY CORPORATION, an Oklahoma corporation, and<br>(2) RANDOLPH L. COY,<br><br>Defendants. | Case No. CIV-18-86-M |

## COMPLAINT

Plaintiffs, Thomas P. Hogan and SJM 1, LLC, a foreign limited liability company (collectively, "Plaintiffs"), for their Complaint against the Defendant, Ranken Energy Corporation, allege and state as follows:

## PARTIES AND JURISDICTION

1.     Thomas P. Hogan ("Hogan") is an individual residing in the State of California.

2.     SJM 1, LLC ("SJM") is a Colorado limited liability company with its principal place of business in Englewood, Colorado.

3.     SJM's sole member is Paul D. Maniscalco ("Maniscalco"), an individual residing in the State of Colorado.

4.     Ranken Energy Corporation ("Ranken") is a corporation formed under the laws of the State of Oklahoma with its principal place of business in Edmond, Oklahoma.

5.      Randolph L. Coy ("Coy") is an individual residing in the State of Oklahoma.

6.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs have alleged violations of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77a, *et seq.* Plaintiffs' additional state law claims are so related to Plaintiffs' federal securities law claims that they form part of the same case or controversy and the Court may therefore exercise supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367. Subject matter jurisdiction also exists under 28 U.S.C. § 1332 because the parties have complete diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district and because the Defendant resides in this district for purposes of venue.

## FACTUAL BACKGROUND

*Defendants' solicitation of investments in the NAOCU Drilling Program*

8.      Ranken is engaged in the business of oil and gas exploration.

9.      In or around 2015, Ranken's founder and President, Defendant Coy, and chief marketing consultant, Charles A. Brown ("Brown"), approached Plaintiffs and other individuals in Oklahoma, Texas, and other states to solicit investments in Ranken's North Antioch Oil Creek Unit ("NAOCU") Drilling Program in Garvin County, Oklahoma (the "Project").

10.     Ranken specifically offered to sell undivided working interests in oil and gas leases covering the NAOCU and owned by Ranken in exchange for payment of an initial buy-in cost and the investor's commitment to pay a proportionate share of drilling and completion costs for nine (9) new wells and three (3) recompletion attempts in existing wells. On information and belief, Ranken's goal was to sell the vast majority, if not all, of the working interests in the Project to investors in exchange for significant up front buy-in costs.

11.     In doing so, Ranken actively marketed the sale of fractional undivided working interests in oil, gas, and mineral rights, which are securities under both the federal Securities Act of 1933 and the Oklahoma Securities Act of 2004.

12.     Upon information and belief, neither Ranken, Coy, nor Brown were registered to offer or sell securities under the Oklahoma Securities Act.

13.     In an effort to secure investments in the Project, Ranken provided prospective investors, including Plaintiffs, with a sales brochure boasting that all of the nine NAOCU prospects had been identified with "proprietary state-of-the-art 3D seismic data acquisition, processing and interpretation of the area" that "minimiz[ed] the seismic risk for the investor."

14.     Upon information and belief, and contrary to these representations, Ranken's seismic data was never integrated with actual production information.

15.     In other communications with Plaintiffs, Ranken, through Coy and Brown, represented that investing in the Project came with little to no risk due in large part to Ranken's thorough geological and geophysical study of the NAOCU area.

16.    As a further inducement to investors, including Plaintiffs, Ranken represented that it only drilled vertical wells, which are typically less expensive and less risky than directional or horizontal wells.

17.    Ranken repeatedly emphasized that by only drilling vertical wells it dramatically reduced the risk of investing in the Project.

18.    On its LinkedIn page, which Ranken used and continues to use to solicit investments, Ranken states that it "drill[s] vertical wells less than 8,000 feet deep" and is looking for working interest partners seeking "high-quality, vertical well prospects." On information and belief, this same representation also appeared on Ranken's website, www.ranken-energy.com, which Ranken also used to solicit new investors, at the time Plaintiffs were deciding whether to invest in the Project.[1]

19.    Not only did Ranken publicly promote that it drilled only vertical wells, it made the same representation, through Coy and Brown, directly to Plaintiffs on numerous occasions as part of Ranken's effort to secure Plaintiffs' investment in the Project. Coy and Brown made these representations knowing that Plaintiffs wanted to minimize the cost and risk of oil and gas investment and were interested only in low-risk vertical wells.

---

[1] Ranken's website has been redesigned since the time Plaintiffs were considering investing in the Project; however, as recently as December 1, 2017, Ranken's website continued to extoll the benefits (both in cost and risk) of drilling vertical wells. *See* https://www.ranken-energy.com/index.php/2017/12/01/why-drill-vertical-wells/. Ranken appears to have changed its website after receiving correspondence from Plaintiffs in the fall of 2017, in which Plaintiffs identify as one of their charges against Ranken that it had materially misrepresented the planned drilling of vertical wells. Ranken's knowing and willful modification and destruction of electronically stored information relevant to this dispute will be the subject of a later motion by Plaintiffs.

20.    In addition to Ranken's affirmative representations to Plaintiffs that it only drilled vertical wells, information in Ranken's NAOCU sales brochure was designed to lead investors to believe that the Project involved only vertical wells. For example, Ranken's "state-of-the-art" seismic maps for each prospect depicted proposed well locations using vertical lines, and an included Authority for Expenditure ("AFE") for the Hope #1-5 well indicated that floating equipment, centralizers, and scratchers— equipment regularly used in directional drilling operations—would not be used.

21.    At no point did Ranken ever tell Plaintiffs that it intended to drill more expensive and risky directional wells rather than vertical wells. If it had, Plaintiffs would not have invested in the Project, a fact Plaintiffs informed Ranken of before agreeing to invest.

***SJM's Investment in the NAOCU Drilling Program***

22.    On or about October 13, 2016, after discussing the Project with Ranken and reviewing information provided by it, including Ranken's sales brochure, SJM executed a Letter Agreement (the "NAOCU Letter Agreement") providing that SJM would purchase an undivided 1% working interest in the NAOCU Drilling Program for an initial buy-in cost of $40,000. The NAOCU Letter Agreement provided that Ranken would drill and SJM would participate in nine "obligatory" test wells and three "obligatory" recompletion attempts and would become a signatory to a Joint Operating Agreement ("JOA") prepared by Ranken. The NAOCU Letter Agreement also provided that Ranken would assign to SJM its proportionate share of leasehold within thirty (30) days of closing.

23.     SJM paid Ranken the agreed-upon buy-in cost and executed Ranken's JOA, which was a modified A.A.P.L. Form 601-1982 Model Form Operating Agreement promulgated by the American Association of Petroleum Landmen.

24.     SJM also executed AFEs for the Hope #1-5, Mary #1-5, and Kay #1-8 and paid Ranken its proportionate share of the drilling and completion costs for those wells. Until the present dispute arose, SJM also paid its share of other leasehold costs for existing wells pursuant to joint interest billing statements issued by Ranken. To date, SJM has paid Ranken in excess of $75,000.00.

25.     Ranken never assigned SJM its proportionate share of leasehold, as required in the NAOCU Letter Agreement, even after SJM made demand on Ranken in a letter dated November 16, 2017.

***Hogan's Investment in the NAOCU Drilling Program***

26.     After discussing the Project with Ranken and reviewing information provided by it, including Ranken's sales brochure, Hogan agreed to purchase a 2.5% working interest in the Project from non-party Drumright Oilwell Services ("Drumright"), which had purchased the interest from Ranken on or about November 13, 2015, pursuant to a letter agreement identical to the one executed by SJM.

27.     On or about February 2, 2017, Hogan executed an Acknowledgment, prepared by Ranken, which stated that, effective February 1, 2017, Hogan had purchased a 2.5% working interest in the Project and agreed to be bound by all terms and conditions outlined in the Letter Agreement between Drumright and Ranken. Hogan also became a signatory to Ranken's JOA.

6

28.     Hogan executed AFEs for the Hope #1-5, Mary #1-5, and Kay #1-8 and paid Ranken his proportionate share of the drilling and completion costs for those wells. Until the present dispute arose, Hogan also paid his share of other leasehold costs for existing wells pursuant to joint interest billing statements issued by Ranken. To date, Hogan has paid Ranken in excess of $75,000.00.

*The NAOCU Joint Operating Agreement*

29.     The JOA executed by SJM and Hogan designated Ranken as Operator for the NAOCU drilling program.

30.     Article V.A of the JOA, titled "Designation and Responsibilities of Operator," provided that Ranken, as Operator, would conduct all operations "in a good and workmanlike manner." In the exculpatory clause that followed, the parties agreed that Ranken would "have no liability as Operator to the other parties for losses sustained or liabilities incurred, except as may result from gross negligence or willful misconduct."

31.     In Article VI.A, Ranken agreed to "commence the drilling of the initial test well to a depth sufficient to test the deepest prospective reservoirs in the 2014-1 NAOCU Drilling Program."

32.     In Article VI.B.1, Ranken agreed that if it desired to drill wells other than the initial test well, it would "give other parties written notice of the proposed operation, specifying the work to be performed, the location, the proposed depth, objection formation and the estimate cost of the operation by an AFE."

33.     In Article VI.B.4, Ranken agreed that all provisions of the JOA applicable to a "deepening" operation would also be applicable to any proposal to "directionally

control and intentionally deviate a well from vertical so as to change the bottom hole location . . . unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties." This meant, among other things, that Ranken was required to give written notice of its intent to drill directionally and, further, that no well was to be drilled directionally without the consent of the parties to the JOA.

34.    Article VI.D provides that each party to the JOA "shall have access at reasonable times to information pertaining to the development or operation [of the Contract Area], including Operator's books and records relating thereto."

35.    Section I.5 of Exhibit C to the JOA further provides that non-operators "shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered.

36.    Section III.1.B. authorizes Ranken to charge overhead expenses to the Joint Account on an exorbitant fixed-rate basis of $6,000.00 per month per drilling well and $550.00 per month per producing well.

***The NAOCU Drilling Program Operations***

37.    Despite representing that it only drilled vertical wells and leading Plaintiffs to believe that all of the Project wells would be vertical, Ranken filed an application with the Oklahoma Corporation Commission ("OCC") on February 14, 2017, to drill the Hope #1-5 well as a "directionally drilled well." The application was approved on March 23, 2017, and the permit issued to Ranken clearly indicated that the well was a "directional hole."

38.     Ranken also applied to and was granted a permit to drill the Mary #1-5 as a directional hole.

39.     Neither SJM nor Hogan were provided with copies of the OCC applications or permits and were not otherwise given written notice by Ranken that the Hope #1-5 and Mary #1-5 were to be drilled directionally.

40.     In addition to misleading Plaintiffs about the nature of the wells to be drilled, Ranken failed to conduct drilling operations in a good and workmanlike manner and was grossly negligent by, among other things:

   a. Drilling the Hope #1-5 and the Mary #1-5 wells as directional wells, even though there was no need to do so;

   b. Failing to use centralizers or scratchers when attempting to drill and complete the Hope #1-5 and Mary #1-5 wells, which any reasonably prudent operator would know dramatically increased the likelihood of a failed drilling operations;

   c. Using "lite" cement in completion operations for the Hope #1-5 and Mary #1-5 when it is well-recognized industry standard practice to use a different class of cement; and

   d. Employing the same unsuccessful drilling and completion practices in the Mary #1-5 as were used in the Hope #1-5.

41.     Additionally, after numerous failed "squeeze jobs" to try and complete both the Hope #1-5 and Mary #1-5 wells, Ranken notified Plaintiffs that both wells would be plugged and abandoned.

42.     On information and belief, Ranken's decision to drill the wells directionally, with improper completion cement, and without centralizers and scratchers, resulted in the eventual failure of the operations.

43.     Ranken's grossly negligent conduct also resulted in significant cost overruns for the Mary #1-5, which Ranken then passed on to Plaintiffs and other working interest owners that invested in the Project.

44.     Ranken was also grossly negligent with regard to the Kay #1-8 well, which was drilled, on information and belief, without having any geological data necessary to make a successful well. As a result, the Kay #1-8 well also ended up being a dry hole.

45.     After the third dry hole, Ranken stopped regularly communicating with Plaintiffs (other than continuing to send them joint interest billing statements) and has not provided Plaintiffs with any information on when (or whether) it will drill the remaining six "obligatory" wells and three "obligatory" recompletes.

*46.*     Plaintiffs notified Ranken on November 16, 2017, of their concerns about Ranken's handling of drilling operations and requested that Ranken make the required assignments to SJM and provide Plaintiffs with access to Ranken's books and records, as allowed under the JOA. Ranken did not respond.

***SJM's Investment in the Edge Prospect***

47.     While drilling operations for the Mary #1-5, Hope #1-5, and Kay #1-8 were still ongoing, Ranken approached SJM and Hogan about investing in another "low-risk" drilling program called the 2016-1 Turkey Creek Drilling Program (the "Edge Prospect").

48.     On or around June 21, 2017, SJM executed a second Letter Agreement with Ranken agreeing to purchase a 1% working interest in the Edge Prospect for a total buy-in cost of $3,400 and payment of its proportionate share of drilling and completion costs (the "Edge Agreement"). The other terms of the Edge Agreement were substantially identical to the NAOCU Letter Agreement, including Ranken's agreement to assign SJM its proportionate share of leasehold.

49.     To date, Ranken has not made any effort to commence drilling operations for the Edge prospect and has not assigned SJM its proportionate share of leasehold, as required by the terms of the Edge Agreement.

## CAUSES OF ACTION

### COUNT I:
### VIOLATION OF THE SECURITIES ACT OF 1933

50.     Plaintiffs restate and incorporate the allegations in Paragraphs 1-50.

51.     Ranken sold Plaintiffs fractional undivided interests in oil and gas leases, which are securities under the Securities Act of 1933, 15 U.S.C. § 77b(a)(4).

52.     As described above, Ranken offered and sold these securities using means or instruments of transportation or communication in interstate commerce or by the mails, by means of a prospectus and/or oral communications that contained untrue statements of material fact or omitted to state a material fact necessary to make the statements not misleading, in violation of Section 12(a) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2).

53.     As a control person, Coy is jointly and severally liable with Ranken.

54.     Plaintiffs are therefore entitled to recover the consideration paid for the securities, with interest.

## COUNT II:
## VIOLATION OF THE OKLAHOMA UNIFORM SECURITIES ACT OF 2004

55.     Plaintiffs restate and incorporate the allegations in Paragraphs 1-55.

56.     The fractional undivided working interests that Ranken, through Coy and Brown, offered and sold to Plaintiffs are security interests under the Oklahoma Uniform Securities Act of 2004 (the "Oklahoma Securities Act").

57.     Ranken violated the Oklahoma Securities Act by, among other things, (i) transacting business in Oklahoma as a broker-dealer without registering as required by the Act; (ii) employing a device, scheme, or artifice to defraud in connection with the offer and sale of a security; (iii) making untrue statements of material fact in connection with the offer and sale of securities; (iv) omitting to state material facts necessary in order to make its statements, in light of the circumstances under which they were made, not misleading, in connection with the offer and sale of securities; and (v) engaging in an act, practice, or course of business that operated as a fraud or deceit in connection with the offer and sale of securities.

58.     Coy is jointly and severally liable with Ranken for the above violations because he directly or indirectly controls Ranken or is a managing partner, executive officer, or director of Ranken.

59.     As a result of Ranken's and Coy's violations of the Act, Plaintiffs are entitled to recover the consideration paid for the securities, interest at the legal rate per

year from the date of purchase, plus costs and reasonable attorneys' fees or actual damages as provided in Section 1-509(B)(3) of the Act.

## COUNT III:
## FRAUD IN THE INDUCEMENT

60.     Plaintiffs restate and incorporate the allegations in Paragraphs 1-60.

61.     As detailed above, Ranken made numerous material misrepresentations to Plaintiffs regarding Ranken's intent to drill vertical wells using integrated "state-of-the-art" seismic data.

62.     Ranken knew these representations were false at the time they were made.

63.     Ranken made these misrepresentations with the intent that Plaintiffs act upon them and purchase working interests in the Project.

64.     Plaintiffs' agreement to invest in the Project was based on Ranken's misrepresentations.

65.     Plaintiffs are entitled to rescission of their agreements with Ranken pursuant to 15 Okla. Stat. § 233.

## COUNT IV:
## BREACH OF THE LETTER AGREEMENT

66.     Plaintiffs restate and incorporate the allegations in Paragraphs 1-66.

67.     In the alternative to Plaintiffs' claim for fraud in the inducement, Plaintiffs seek damages on account of Ranken's breach of the Letter Agreement.

68.     Plaintiffs tendered performance or were excused from performing their obligations under the Letter Agreement.

69.     Ranken, on the other hand, breached the Letter Agreement by failing to drill all nine obligatory wells or undertake any of the three promised recompletions.

70.     Ranken also breached the Letter Agreement with respect to SJM by failing to assign SJM its proportionate share of leasehold interest in the NAOCU.

71.     As a result of Ranken's breach, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT V:
## BREACH OF THE JOINT OPERATING AGREEMENT

72.     Plaintiffs restate and incorporate the allegations in Paragraphs 1-72.

73.     In the alternative to Plaintiffs' claim for fraud in the inducement, Plaintiffs seek damages on account of Ranken's breach of the Joint Operating Agreement.

74.     Ranken breached the JOA by, among other things, failing to give Plaintiffs written notice of Ranken's intent to drill the Mary #1-5 and the Hope #1-5 directionally and failing to give Plaintiffs access to Ranken's books and records.

75.     As a result of Ranken's breach, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT VI: GROSS NEGLIGENCE

76.     Plaintiffs restate and incorporate the allegations in Paragraphs 1-76.

77.     Ranken had a duty as operator to conduct drilling operations in a good and workmanlike manner and to exercise slight care and diligence.

78.     Ranken violated its duty and was grossly negligent when, among other things, it drilled the Hope #1-5 and Mary #1-5 as directional wells and attempted to complete them using "lite" cement and without appropriate equipment.

79.     Ranken was also grossly negligent by drilling the Kay #1-8 without any geological data to support the well.

80.     As a result of Ranken's gross negligence, Plaintiffs suffered damages in an amount to be determined at trial.

<u>COUNT VII:</u>
<u>VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT</u>

81.     Plaintiffs restate and incorporate the allegations in Paragraphs 1-81.

82.     Ranken's sales of working interests in the NAOCU and Edge Drilling Programs are "consumer transactions" within the meaning of the Oklahoma Consumer Protection Act, 15 Okla. Stat. § 751 *et seq.* ("<u>OCPA</u>")

83.     Ranken engaged in unlawful practices under the OCPA by, among other things, knowingly making false or misleading representations as to the characteristics of a consumer transaction and by otherwise engaging in deceptive or unfair trade practices as defined in the OCPA.

84.     Ranken is liable to Plaintiffs under the OCPA for their actual damages, costs of litigation, and reasonable attorney's fees.

85.     Ranken's acts were also unconscionable and Ranken is therefore liable for the payment of a civil penalty in a sum not to exceed $2,000 for each violation.

## COUNT VIII:
## ACCOUNTING

86.     Plaintiffs restate and incorporate the allegations in Paragraphs 1-86.

87.     Under the NAOCU Joint Operating Agreement, Ranken is obligated to account to Plaintiffs for expenses incurred and charged to the joint account.

88.     Plaintiffs have made demand for an accounting under the JOA, but Ranken has failed and refused to provide the same.

## COUNT IX:
## BREACH OF THE EDGE AGREEMENT

89.     Plaintiffs restate and incorporate the allegations in Paragraphs 1-89.

90.     Ranken breached the Edge Agreement with respect to SJM by failing to assign SJM its proportionate share of leasehold interest and by failing to undertake the promised drilling operations within a reasonable time.

91.     As a result of Ranken's breaches, SJM has been damaged in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs request that the Court:

(A)     Order Defendants to account to Plaintiffs for all expenses charged to the joint account under the Joint Operating Agreement;

(B)     Award Plaintiffs all damages available to them under the common law, the Securities Act of 1933, the Oklahoma Uniform Securities Act of 2004, and the Oklahoma Consumer Protection Act, including amounts paid to Ranken for Plaintiffs' buy-in and operating costs for the NAOCU Drilling Program and SJM's buy-in cost for the Edge Drilling Program;

(C)     Rescind each of the agreements between Ranken and Plaintiffs;

(D)     Award Plaintiffs pre- and post-judgment interest, court costs, and

reasonable attorney's fees, as authorized under the Oklahoma Uniform

Securities Act of 2004 and the Oklahoma Consumer Protection Act;

(E)     Award Plaintiffs exemplary damages; and

(F)     Award Plaintiffs all other and further relief, both general and special, at law

and in equity, to which they may show themselves justly entitled.

Respectfully submitted,


/s/ David A. Elder
David A. Elder, OBA #20687
Erin L. Gregory, OBA #32787
HARTZOG CONGER CASON & NEVILLE
201 Robert S. Kerr, Suite 1600
Oklahoma City, OK 73102
(405) 235-7000
(405) 996-3403 (Facsimile)
delder@hartzoglaw.com
egregory@hartzoglaw.com
**ATTORNEYS FOR PLAINTIFFS,**
**THOMAS P. HOGAN AND SJM 1, LLC**

**JURY TRIAL DEMANDED**